1

2

3

4

5

6

7

8                                  UNITED STATES DISTRICT COURT

9                              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    DOLPHUS DWAYNE PIERCE,                          Case No.  1:20-cv-00459-DAD-HBK

12                       Petitioner,                  FINDINGS AND RECOMMENDATIONS TO
                                                      DENY PETITION FOR WRIT OF HABEAS
13           v.                                       CORPUS AND TO DECLINE TO ISSUE A
                                                      CERTIFICATE OF APPEALABILITY[1]
14    ERICA HOLIFIELD, T.R. MERICKEL,
                                                      FOURTEEN-DAY OBJECTION PERIOD
15                       Respondents.
                                                      (Doc. No. 1)
16

17           Petitioner Dolphus Dwayne Pierce, a state probationer represented by counsel, has

18    pending a petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. No. 1).  The Petition

19    raises two grounds for relief: (1) the trial court failed to require jury unanimity on the criminal

20    objects of his conspiracy charge and (2) the prosecutor's office was biased against him.  (*See*

21    *generally id*.).  For the reasons set forth below, the undersigned recommends the Court deny

22    Petitioner any relief on his petition and decline to issue a certificate of appealability.

23                                          **I.  BACKGROUND**

24           **A.  Procedural History**

25           Pierce initiated this case on March 31, 2020 by filing the instant petition.  (Doc. No. 1).

26    On April 15, 2020, the Court ordered Respondents to respond to the petition.  (Doc. No. 6).  On

27    _____

28    [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
      (E.D. Cal. 2019).

1    June 10, 2020, Respondents filed an answer to the petition and lodged the pertinent state court

2    record.  (Doc. Nos. 13, 14, 15, 16).  On July 6, 2020, Pierce filed a reply.  (Doc. 17).  On

3    November 17, 2020, the case was reassigned to the undersigned.  (Doc. No. 18).

4          **B. Facts Based Upon the Record**

5          In 2016, a Kern County jury convicted Pierce of conspiracy to commit insurance fraud.

6    (Doc. No. 13 at 12).  Pierce was sentenced to five years of probation on the condition that he

7    serve one year in jail and was ordered to pay restitution.  (*Id.*)  The Court sets forth below the

8    pertinent facts of the underlying offenses, as summarized by the California Court of Appeal.  A

9    presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v.*

10   *Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

11         **Introduction**

12         Operating under their company, P&R Med-Legal Medical
           Corporation (P&R), Dolphus Dwayne Pierce II, a chiropractor, and
13         Tomas Ballesteros Rios, a physician, conspired with others to
           defraud various workers' compensation insurance carriers.  P&R
14         contracted with physicians to perform cursory (if any) examinations
           of workers' compensation patients at chiropractic clinics, and then
15         dispense prepackaged medications to these patients with little or no
           regard for medical need.  Pierce and Rios contracted with a
16         company to prepare and submit canned medical reports and bills to
           workers' compensation insurance carriers.  These bills sought
17         payment for the medications dispensed, and for services relating to
           the dispensing of medications—some of which were not performed,
18         and some costlier than the services actually performed by the
           physician.  Eventually, a search warrant was executed on businesses
19         and homes associated with P&R.  After P&R shut down, Pierce and
           Rios contracted with another company to rebill the insurance
20         carriers for services initially billed by P&R, seeking to collect on
           existing unpaid bills for medications previously dispensed.
21
22         **Prosecution's Evidence**

23         **Witness Tomas Rios, M.D.**

24         Rios pled guilty to conspiracy as charged in count 1 and testified
           for the prosecution.
25
           In the mid 1990's, while still a medical resident, Rios began
26         moonlighting at a physician's group as a disability evaluator for
           Social Security claimants, where he met Dr. Lonnie Powell, a
27         chiropractor.  The physicians' group rented office space from
           Powell in Visalia, and Rios saw Social Security disability patients
28         there two weekends a month.

                                        2

During this time, Rios familiarized himself with the operations of medical corporations having a chiropractic partner, and between 1999 and 2002, Rios and Powell formed Physicians Medical Management Group (PMMG), which managed independently contracted physicians to provide medical services as secondary treating physicians for workers' compensation patients at various chiropractic locations throughout California.  Most of the chiropractors whose workers' compensation patients were seen by these independent contractor physicians were friends and acquaintances of Rios or Powell.  The chiropractors were seeking physicians to provide medication and care for their workers' compensation patients.

As explained by Rios, in the workers' compensation system generally, the chiropractor (as primary treating physician) can provide therapy, but many patients need some type of pain medication, which a chiropractor cannot prescribe.  The chiropractor would then refer the patient to a PMMG physician (as a secondary treating physician), who would come to the chiropractic clinic, do their own evaluation and prescribe medication if appropriate.  The physician generated a report and signed it, a bill was then prepared, and the report and bill were sent out by PMMG to the workers' compensation insurance carriers.  Payment was made by the carriers to PMMG.

Rios knew which various current procedural terminology (CPT) codes were related to the medical services provided and determined which CPT codes would be billed by PMMG for a physician's services.  According to Rios, because the cases referred by chiropractors to the physicians involved nonsurgical muscular-skeletal injuries, the injuries were similar from patient to patient.  As such, Rios "already" knew what treatment would be required for the physician to manage the patient, allowing Rios to predetermine what code was necessary to bill.  Unless the physician corrected the report to indicate such services were not provided, it was billed as Rios predetermined.

Rios testified that there are five levels of examinations specified in the CPT billing codes, ranging from the most basic to the most complex.  The report given to the physician would have a specific, predetermined statement on the level of care expected of him, such as a comprehensive medical examination or an intermediate medical consultation.  The initial consultation could take anywhere from 30 to 60 minutes and the CPT billing code for that consultation was set at the highest level of service.  Follow-up consults were scheduled for less time and billed for less.  Rios acknowledged that he might not have specifically articulated to the physicians hired by PMMG that the treatment level, depicted in the reports he showed them as examples, were necessarily the CPT codes that would be billed.

PMMG also created a formulary of medicines purchased by PMMG that could be dispensed by the consulting physician.  The formulary was a collection of medications Rios predetermined would be used in the practice, although the independent contractor physician could

3

also write a prescription for medication they deemed more appropriate.  PMMG would purchase medications to be dispensed with an expectation of later repayment by the workers' compensation insurance carrier.  Since 80 to 90 percent of the workers' compensation patients referred to the physicians suffered back pain, it was anticipated that the physicians would utilize the formulary of medicines that were available for dispensing.  Rios testified that he expected the physicians to dispense medication, because "that's the reason why [the physician is] in the clinic in the first place."

In 2003, Rios began doing business with Pierce.  By this time, Rios was not only actively engaged in PMMG, but he had also partnered with various other medical groups and clinics.  Pierce had chiropractic practices in Avenal and Huron and was familiar with the PMMG business plan of placing a physician in a chiropractic clinic to serve as a secondary treating physician.

Rios and Pierce met to discuss forming rural health clinics in Avenal and Huron.  Pierce provided the offices for the clinics as part of his contribution to the venture.  Rios suggested a business similar to PMMG.  Pierce was familiar with this type of consultation because he had treated workers' compensation patients and had physicians come to his office to examine and dispense medication to patients who needed it.

In January 2004, P & R was formed to operate as PMMG did.  Rios was the 51 percent owner, Pierce owned 49 percent.  Pierce was the incorporator of P & R and its president.  Because Pierce knew many chiropractors, it was agreed he would market P & R services to them.  A form lease was created for the physicians; they were to pay for each day or half day of space they used at various chiropractic offices when seeing workers' compensation patients.  Pierce met with prospective chiropractors to discuss the services P & R could provide; Rios's duty was to find physicians that, "in [his] judgment, have a working understanding of what a secondary treating physician would be."

At a May 2005 P & R shareholder's meeting, Pierce, as treasurer, reported that P & R "was doing very well and ... presently has five (5) doctors that are doing examinations for chiropractors and writing reports.  He advised that [P & R] is making a very good profit but could be doing much better.... [And] if the workers['] compensation insurance will start accepting their responsibility to their workers that he anticipates that [P & R] could become very profitable."

A company called Premier Interpreting and Support Services (Premier) handled a variety of tasks for P & R, including billing, scheduling the physicians, providing medical assistants for the physicians on site, and providing typing services to generate the final physician's report.  Premier was owned on paper by Rios's sister Cecilia Cabangangan (one of the original codefendants), but the business was capitalized by Rios.  Rios hired Veronica Aguayo as the office manager at P & R and Premier.  She had previously

been Rios's medical assistant and was familiar with his practice routine.

Rios directed Aguayo on how he would like to set the formulary, how to have an adequate supply of medications available to dispense, and how the physician's reports were to be generated. Rios directed Aguayo to tell the physicians their DEA registration numbers would be used to purchase medications they would be dispensing.

Rios created the template worksheets, used to generate typewritten reports, for the physicians to fill-out after they had completed an exam. Spaces in the template allowed the physician to note symptoms other than those set forth in various alternative template paragraphs. The reports were then transcribed using the template manual to create the report in narrative form. This was done in the Philippines by Rios's relatives, who were paid by Premier. Rios's relatives handled the transcribing for P & R, as well as for other medical groups and clinics owned by Rios. In the early stages of P & R, the finished reports were given to the physicians to review and sign; later the reports were scanned by a server with electronic signatures already affixed.

Patty Steck oversaw billing at Premier. She initially reported to Rios, who showed her what CPT codes to use for office visits, etc., and directed her on how to determine the price to bill for dispensed medication. At one point, Rios decided to "downcode" comprehensive consultations to intermediate ones because insurance carriers were either disputing the charges or down coding them on their own. Rios decided to accept the down coded payment rather than having the matter in dispute; Rios told Pierce about this.

Sometime before the search warrants were executed on April 15, 2008, Rios decided to wind down his practices, including the operation of P & R, and allow California Consultation Medical Corporation (CCMC), owned by Pierce and Yang, one of the contracted physicians with P & R (and original codefendant), to take over the P & R practice, including existing medication supplies, medical charts, and seeing P & R patients. Rios was to receive consideration for the assets P & R was transferring to CCMC.

**Witness Monica Murphy, M.D.**

Monica Murphy, previously a physician, was granted use immunity upon the prosecutor's request before her testimony. Following a conviction for tax evasion in 2003, Murphy was not able to practice on her own and was hired as a physician by Rios to work for Visalia Industrial and P & R. She later lost her medical license and worked for P & R as a medical assistant for about a year.

As a physician at P & R, Murphy dispensed medication to patients, medications which were based on a formulary that she did not have input into. P & R did not notify patients of the option to receive a

5

prescription for medications they could use on their own, rather than having them distributed at the clinic. As a physician at P & R, Murphy did not think she could change the diagnosis of the patient made by the chiropractor.

Initially, Murphy dictated a report of her visit with the patient, forwarded the dictation to Rios, Rios transcribed it into a report, and she then signed it, a process that took several months. Murphy did not have any documents in her possession to compare her original report with the final report. Later, Rios developed a template which generated the typewritten report. The signatures were affixed via electronic signature, which Murphy did not do herself. She did not have the capability to log onto the computer system to see the final report.

On the template, Murphy circled numbers to match preprinted language. She did not always have the guide book of CPT codes to know which numbers she was circling. Murphy testified that her schedule did not allow for a "comprehensive top-down review" of each patient, and if the final report reflected that such had occurred, it would not be true. Murphy was unfamiliar with the coding requirements for different CPT office visits or consultation codes. Murphy claimed she had very little interaction with Pierce and he never advised her on a medical issue.

**Witness Cynthia Jones, M.D.**

Cynthia Jones, M.D., worked for P & R as a physician for approximately two years, beginning in 2005. When she was hired by Rios, he explained that she would be using a template to help generate reports, but he did not discuss much in terms of the actual patient care she would be responsible for. She understood her "purpose" in that position was to dispense "a particular group of drugs," the formulary, which was "profitable when they billed the work[ers'] comp[ensation] company." She did not dispense all the drugs to every patient, and it was not until "later that [she] figured out that they had expected [her] to do that."

Jones was trained by Dr. Yang. Yang showed her how to complete the template that generated the final report. Yang told her to randomly circle different numbers of CPT codes for consecutive patients so that the reports would not all look the same. Yang told Jones it was not really important what numbers were circled, so she circled them at random.

Jones acknowledged that she never did a case conference, a post-exam case conference with the chiropractor to discuss a patient's needs, although she always checked the template "yes" to indicate that a case conference had taken place. She thought either Aguayo or Yang most likely told her to do that. Jones also acknowledged that she never did a comprehensive consultation with a new patient, but she claimed she did not know if she circled certain numbers on the template that would indicate otherwise. There was no template language on the worksheet for an option of "no medications" dispensed.

Jones was not given the key to the template used until over a year after she started working for P & R.  Once she received the key, she still circled numbers randomly.  Jones met Pierce only twice and did not discuss billing with him.

**Witness Chi Hong Yang, M.D.**

Yang surrendered his medical license as a condition of his guilty plea to a conspiracy involving all named defendants charged in count 1.  When Yang met Pierce, Pierce explained in general the physician consultation position and some of the paperwork involved.  Pierce told Yang that Rios, as the physician who also had a law degree, would explain how to complete the form used to make a completed medical report.  Yang would be paid per day or half day of work.

Yang then met with Rios, who explained more about the template and told him he did not have to worry about which paragraph numbers he circled.  At P & R, Yang usually saw 10-15 patients a day, for around 20 minutes per patient.  Yang testified he did not do comprehensive examinations, although he examined every patient carefully.

Yang's signature to the reports were affixed electronically, although Yang testified that, after he participated in a deposition in August of 2007, he was told to electronically sign the finished report personally.  Yang did not feel it necessary to check the report with his records.

The longest Yang spent talking to a chiropractor about a patient while working at P & R was two minutes, and he never documented those conversations.  He spoke to the chiropractor for only about 20 percent of the patients he had seen.  Nevertheless, while working at P & R, Yang circled on the template that a case conference had been done on every case.  He also circled "reverse case conference," which would generate a report to the chiropractor that he had participated in a case conference.  He was told to do this by office manager Aguayo.

Yang also worked at the Huron and Avenal medical clinics, and claimed that, when he signed the contract to work at the clinics, he thought he was signing a contract to work for P & R.  Although he was the medical director of the clinic in Huron, Yang did not hire the physician assistants, Rios did.  Yang testified that it was Pierce who was his boss and he was the one who determined what the contents of the medical charts at the rural clinics should contain, but he was not certain who determined what medications to have on hand.  Aguayo told him he needed to have a separate DEA number to purchase medication for each rural clinic.

In late 2007, Yang and Pierce decided to form their own company which would eventually take over P & R.  Their company, CCMC, was incorporated in January 2008, with Yang owning 51 percent and Pierce owning 49 percent.  In this new business, Yang visited the same chiropractic offices he had previously visited for P & R

and saw the same patients.  They used the same template that was developed at P & R in late 2007, and Yang personally signed the template used to generate reports, which were sent off for completion.

During Yang's trial testimony, he was asked about the two days of depositions he participated in during the investigation of a workers' compensation case.  Yang testified that, after the first deposition session, Pierce told him he should state during the second session that he had always checked the patient charts before he signed them, which was not true.  Yang testified that, while he did not want to lie, he needed a job and he did not want P & R to close, which Pierce said would happen if "things [did] not go well."  Yang testified he made the untrue statement because he was asked to do so by Pierce.

During the second deposition session, an attorney, Michael Farley, provided by Pierce, was present with Yang.  Pierce told Yang that Farley would be there because Yang was "so nervous" during the first deposition session.  In anticipation of the second session, Yang stated he brought the medical billing code book with him and let Farley know that he had it.  Farley told him to keep the code book in his "suitcase" and not to take it out before Farley told him to do so.  Yang was asked about the code book during the deposition. When he began to answer, Farley stopped him and "beg[a]n to argue with the person in the deposition."  Yang understood this to mean that he should not produce the code book, so he did not. Instead, Yang testified "I make a whole bunch of lie after that.  I tell a lot of lie." One such lie was that he had taken the code book with him to each patient visit to help him circle the correct code numbers for the visit.  Yang felt that this was what Farley wished him to do.

When Yang was given a copy of the deposition and asked to review and sign it, Yang spoke to Pierce about his lies during the deposition.  Pierce told him he would consult with Rios, who also had a law degree, but he never heard from them about it again, and Yang signed the deposition as being accurate.

A search warrant was executed on April 15, 2008, while Yang was working at a chiropractic office in San Leandro through CCMC. After the search, Yang called Pierce, because he was his boss.  The following day, Yang and Pierce met Farley.  Pierce told Yang that CCMC could not continue doing business because their "computer[s] and everything" were seized, and asked for Yang's company credit card and car, which he returned.  Pierce told Yang to get an attorney and not to discuss the issues with anyone.

Approximately a year later, Cathy Pierce asked Yang to sign 126 patient charts for consultations that took place before April 15, 2008, so they could be billed.  Yang eventually complied.  CCMC was eventually dissolved in December 2009.

8

**Witness Veronica Aguayo**

Aguayo testified she began as a medical assistant for Rios and chiropractor Steven Booth.  She then went to work with Rios at another of his corporations and in late 2003 began at Premier as the office manager.  Aguayo and Rios's sister Cabangangan, who owned Premier, hired billers for Premier, including Patty Steck.  It was Cabangangan who gave the billers directions on how to bill.  When Rios and Pierce created P & R in 2004, Aguayo became the office manager there.  In that position, she worked as a medical assistant and recruited physicians for the various companies.  She also maintained the schedule for the medical assistants and ordered medications.

In her position at P & R, Aguayo had contact with Pierce "[a]lmost daily," and often accompanied him to various clinics around the state.  She also had frequent contact with Pierce's wife Cathy, who did the bookkeeping and accounts payable for P & R.  Aguayo and Pierce discussed collections, the schedule, and medications.  Regarding collections, Pierce wanted to know what P & R collections were each day.  Aguayo faxed Pierce information on how well insurance carriers were paying in response to bills issued by Premier.

The two talked at times about how to increase the amount of money paid by the carriers.  Pierce provided Aguayo with a form he had used in his own chiropractic offices which he wanted the billers at Premier to use.  The form was to be sent out with the bills and explained why certain codes needed to be paid, resulting in quicker payments.  Pierce expressed to Aguayo how he wished the billing to be done, and she would instruct the billers to do so.  In January of 2008, Aguayo sent a fax to an attorney, on behalf of Pierce, asking whether P & R could continue to bill certain medical procedural codes.  After being asked by Pierce to do so, Aguayo began tracking every individual patient to see what the insurance carrier was or was not paying for.  This led to color coding patient files to more easily determine which carriers paid and which did not.

According to Aguayo, when P & R began, the whole set of medications, or formulary, would be given to every patient.  With information gathered from the color-coding system, Pierce directed Aguayo to give each individual patient only the medications his or her insurance was paying for.  Pierce explained to Aguayo that this was necessary to keep P & R profitable.  No billing was done on P & R's behalf after May 15, 2008.

**Witness Edith Cuartas**

After law enforcement executed the search warrant on the businesses and homes associated with P & R in April 2008, Premier dissolved, and a few months later, P & R closed.  On February 1, 2009, Pierce and Rios on behalf of P & R contracted with Edith Cuartas, owner of Alpha Billing and Collection (Alpha), to rebill only for the medications P & R dispensed earlier.  Pierce and Rios

gave Cuartas an accounts receivable report for P & R and the amount was "in the millions."  Alpha began rebilling for P & R in 2009 and continued through 2012, collecting between $1 and $2 million dollars for P & R.

**Defense**

Pierce testified in his own behalf.  He had been a chiropractor for many years in Huron and Avenal. After he was injured, it became more difficult for him to treat patients, and he became interested in converting his chiropractic offices into rural health clinics.

Pierce did not dispute that P & R, in practice, was operating in a manner to defraud workers' compensation insurance carriers.  However, he claimed ignorance of any fraudulent billing practices and that he had no intent to defraud.  Pierce testified that his role was to market the P & R model to chiropractors and pay expenses to keep the business running, and that it was Rios who was responsible for all medical aspects of P & R, including what medical services P & R would provide and bill for.  While Rios had explained to him how P & R would operate, Pierce took no steps to educate himself on the details of the P & R operation on the medical side.

Pierce placed much of the blame with the physicians who were contracted to work at P & R, but he stated that he "never thought they would be dishonest."  Pierce claimed he did not know the physicians were not conferring with the chiropractors about the patient's care and were not truthful in noting the level of care provided or amount of time spent with the patients.  As to the later rebilling for medications, Pierce, relying on Rios, believed the medications were actually dispensed because of tracking forms.  Rios had also told him physicians would not dispense medications without doing an examination.

(Doc. No. 13 at 12-19); *People v. Pierce*, No. F074602, 38 Cal. App. 5th 321, 326-34 (2019).

## II.  APPLICABLE LAW

### A.  AEDPA General Principles

A federal court's statutory authority to issue habeas corpus relief for persons in state custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

1   *Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits

2   relief on a claim adjudicated on the merits, but only if the adjudication:

3          (1) resulted in a decision that was contrary to, or involved an
          unreasonable application of, clearly established Federal law, as
4          determined by the Supreme Court of the United States; or

5          (2) resulted in a decision that was based on an unreasonable
          determination of the facts in light of the evidence presented in the
6          State court proceeding.

7   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

8   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

9          "Clearly established federal law" consists of the governing legal principles in the

10  decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

11  U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

12  unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

13  to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

14  governing law set forth by Supreme Court case law; or (2) reached a different result from the

15  Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

16  12, 16 (2003).

17         A state court decision involves an "unreasonable application" of the Supreme Court's

18  precedents if the state court correctly identifies the governing legal principle, but applies it to the

19  facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

20  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

21  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

22  extend that principle to a new context where it should apply."  *Williams v. Taylor*, 529 U.S. 362,

23  407, (2000).  "A state court's determination that a claim lacks merit precludes federal habeas

24  relief so long as fair-minded jurists could disagree on the correctness of the state court's

25  decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  The petitioner must show that the

26  state court decision "was so lacking in justification that there was an error well understood and

27  comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 103.

28

1    When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

2    State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

3    the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

4    *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

5    merely because the federal habeas court would have reached a different conclusion in the first

6    instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

7    As discussed earlier, for the deferential § 2254(d) standard to apply there must have been

8    an "adjudication on the merits" in state court. An adjudication on the merits does not require that

9    there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

10   at 98. "When a federal claim has been presented to a state court and the state court has denied

11   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

12   of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption

13   may be overcome when there is reason to think some other explanation for the state court's

14   decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to

15   discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

16   289, 293, 298-301 (2013).

17   While such a decision is an "adjudication on the merits," the federal habeas court must

18   still determine the state court's reasons for its decision in order to apply the deferential standard.

19   When the relevant state-court decision on the merits is not accompanied by its reasons,

20   the federal court should "look through" the unexplained decision to
21   the last related state-court decision that does provide a relevant
     rationale. It should then presume that the unexplained decision
     adopted the same reasoning. But the State may rebut the
22   presumption by showing that the unexplained affirmance relied or
     most likely did rely on different grounds than the lower state court's
23   decision, such as alternative grounds for affirmance that were
     briefed or argued to the state supreme court or obvious in the record
24   it reviewed.

25   *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state

26   court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

27   decision, as AEDPA directs us to do." *Id*. at 1196.

28   ///

12

1
2
3
4
5

> When . . . there is no reasoned state-court decision on the merits, the federal court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 102.  If such disagreement is possible, then the petitioner's claim must be denied. *Ibid.*

6  *Sexton*, 138 S. Ct. at 2558.

7  ### III.  ANALYSIS

8  For purposes of reviewing each of Petitioner's claims, the Court considers the last

9  reasoned decision on Petitioner's claims—that of the California Court of Appeal.

10  **A.  Ground One: Unanimity Instruction**

11  **1.  Background**

12  Pierce argues that the trial court violated his Fifth, Sixth, and Fourteenth Amendment

13  rights when it failed to require the jury to unanimously find that he committed at least one of the

14  same criminal objects of the conspiracy charge.  (Doc. No. 1 at 5).  In support of his argument,

15  Pierce claims that the four code sections with which he was charged are four separate criminal

16  objects because each code section has different punishments, criminal elements, and factual

17  defenses.  (*Id.*).  Pierce argues that the jury should have been instructed that a conviction for

18  conspiracy required a unanimous finding that Pierce committed at least one of the same acts

19  described in the code sections.

20  At trial, Pierce requested a modified version of the Judicial Council of California Criminal

21  Jury Instruction 415 ("CALCRIM No. 415").[2]  (Doc. No. 14-96 at 37; Doc. No. 14-86 at 185).

22  CALCRIM No. 415 instructs that in order to convict a defendant of conspiracy to commit

23  workers' compensation fraud, all members of the jury must find the defendant guilty of

24

25
26
27
28
[2] Here, the prosecutor's proposed CALCRIM No. 415 jury instruction stated: "The People allege that the defendants conspired to commit the following crimes: knowingly presenting a false or fraudulent material statement in support of a claim for payment of a workers compensation health care benefit, knowingly presenting a claim for a health benefit not used by or on behalf of the claimant, and knowingly presenting multiple claims for payment of the same health care benefit with the intent to defraud.  You may not find a defendant guilty of conspiracy unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes."  (Doc. No. 2-4 at 37).

1   conspiracy to commit at least one of the charged overt acts of the crime of conspiracy.  Here,

2   Pierce was charged with four different methods of committing workers' compensation insurance

3   fraud, which are found in four different California code sections.[3]  (Doc. No. 14-96 at 39).  Pierce

4   sought to add the following language to CALCRIM No. 415: "and you all agree which crime the

5   defendant conspired to commit."  (Doc. No. 14-86 at 185).  In effect, the instruction Pierce

6   requested required the jury to unanimously agree that he committed the same act described in at

7   least one of the code sections as opposed to requiring the jury to unanimously agree that Pierce

8   committed any of the acts described in the code sections.  (*Id*. at 37).  The prosecutor argued that

9   Pierce's proposed instruction was appropriate if Pierce had been charged with multiple crimes

10   charged, but because Pierce was charged with just one crime—conspiracy to commit insurance

11   fraud, the proposed instruction was not appropriate.  (Doc. No. 14-86 at 185).  The prosecutor

12   argued that the four code sections are "all insurance fraud," and are "simply different

13   methodologies that get you to insurance fraud."  (Doc. No 14-86 at 183).

14       The trial court agreed with the prosecutor, finding that the additional instructional language,

15   "and you all agree which crime the defendant conspired to commit" was not required under *People*

16   *v. Vargas*, 91 Cal. App.4th 506 (2001).  (*Id*. at 196-97).  Specifically, the trial court found that

17   Pierce was charged with "conspiring to commit insurance fraud and that the four specific code

18   sections and related conduct that are set forth in the indictment are just different ways of committing

19   the same object."  (*Id*. at 197).

20       **2. State Appellate Court Decision**

21       On appeal, Pierce argued that his Sixth and Fourteenth Amendment rights to a jury trial and

22   due process were violated by the trial court's "refusal to instruct the jury to unanimously agree

23   which of the four discrete target crimes ([Cal. Pen. Code] § 550, subd. (a)(5), (7), (8); [Cal.] Ins.

---

[3] The four code sections with which Pierce was charged were: Cal. Penal Code § 550, subd. (a)(5) (knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim); Cal. Penal Code § 550, subd. (a)(7) (knowingly submit a claim for a health care benefit that was not used by, or on behalf of, the claimant); Cal. Penal Code § 550 (8) (knowingly present multiple claims for payment of the same health care benefit with an intent to defraud); and Cal. Ins. Code, § 1871.4, subd. (a)(2) (present or cause to be presented a knowingly false or fraudulent written or oral material statement in support of, or in opposition to, a claim for compensation for the purpose of obtaining or denying any compensation).

14

Code, § 1871.4, subd. (a)(2)) was the basis for the conspiracy conviction."  (Doc. No. 2-4 at 39).

In California, a criminal jury verdict must be unanimous.[4]  (*Id.*); *People v. Russo*, 25 Cal.4th 1124,

1132 (2001).  However, where the "evidence shows only a single discrete crime but leaves room

for disagreement as to exactly how that crime was committed or what the defendant's precise role

was, the jury need not unanimously agree on the basis or, as the cases often put it, the theory

whereby the defendant is guilty."  *Russo*, 25 Cal.4th at 1132.

The Court of Appeal found that Pierce was charged with one count of conspiracy to commit

workers' compensation fraud and that each of the code sections described a different method of

committing the fraud.  (Doc. No.14-96 at 39-41).  Specifically, the Court of Appeal found:

> In a criminal case, a jury verdict must be unanimous. (Cal. Const.,
> art. I,§ 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 *(Russo).)*
> The jury also "must agree unanimously the defendant is guilty of a
> *specific* crime." *(Ibid.)*  "As a general rule, when violation of a
> criminal statute is charged and the evidence establishes several acts,
> any one of which could constitute the crime charged, either the state
> must select the particular act upon which it relied for the allegation
> of the information, or the jury must be instructed that it must agree
> unanimously upon which act to base a verdict of guilty. [Citation.]"
> *(People v. Jennings* (2010) 50 Cal.4th 616, 679.)  Even absent a
> request, the trial court should give a unanimity instruction "'where
> the circumstances of the case so dictate.' [Citation.]"  *(People v.
> Riel* (2000) 22 Cal.4th 1153, 1199; *see People v. Hernandez* (2013)
> 217 Cal.App.4th 559, 569.)
>
> As the California Supreme Court explained in *Russo,* "[t]his
> requirement of unanimity as to the criminal act 'is intended to
> eliminate the danger that the defendant will be convicted even
> though there is no single offense which all the jurors agree the
> defendant committed.' [Citation.]"  *(Russo, supra,* 25 Cal.4th at p.
> 1132.)  "On the other hand, where the evidence shows only a single
> discrete crime but leaves room for disagreement as to exactly how
> that crime was committed or what the defendant's precise role was,
> the jury need not unanimously agree on the basis or, as the cases
> often put it, the "'theory" whereby the defendant is guilty." *(Ibid.)*
> Hence, "the unanimity instruction is appropriate 'when conviction
> on a single count could be based on two or more discrete criminal
> events,' but not 'where multiple theories or acts may form the basis
> of a guilty verdict on one discrete criminal event.' [Citation.]  In
> deciding whether to give the instruction, the trial court must ask
> whether (1) there is a risk the jury may divide on two discrete

---

[4] "As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." *People v. Jennings*, 50 Cal.4th 616, 679 (2010).

crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at p. 1135.)

And, as stated in *Vargas,* relied on by the trial court below, "[T]he specific crimes that constitute the object of the conspiracy are not elements of the conspiracy.  Rather, they are the means by which the purpose of the conspiracy was to be achieved." *(Vargas, supra,* 91 Cal.App.4th at p. 560.)  Pierce was charged with one count of conspiracy to commit insurance fraud.  Each of the specific crimes that constituted the object of the conspiracy (§ 550, subd. (a)(5), (7), (8); Ins. Code,§ 1871.4, subd. (a)(2)) described the means, namely insurance fraud, by which the purpose of the conspiracy was to be achieved.  The prosecution argued as such below when discussing defense counsel's addition to CALJIC No. 415, stating that the additional wording in the instruction was not necessary because all of the target crimes "amount to insurance fraud" and all were "simply different methodologies that get you to insurance fraud."  Despite Pierce's argument on appeal, defense counsel, during closing when addressing the conspiracy instruction, also referred to the specific crimes in count 1 as "all insurance fraud crimes."  We agree that there was no requirement here to instruct on unanimity.

As part of his argument, Pierce also contends the trial court should have instructed the jury to determine whether one or two conspiracies had been proved, and to agree which conspiracy or conspiracies Pierce participated in.  We disagree.  The decision to charge Pierce with only one conspiracy was a prosecutorial charging discretion that we do not review.  The exercise of that discretion includes questions of prosecutorial policies and judgment, not questions of fact for the jury to determine.  (*Vargas, supra,* 91 Cal.App.4th at p. 553.)

(Doc. No.14-96 at 39-41.)

### 3.  Pierce is Not Entitled to Relief on Ground One

To the extent Pierce claims that the Court of Appeal made an error in its determination of state law, his claim is not cognizable on habeas review.  Federal habeas corpus relief "does not lie for errors of state law," *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), and this court is bound by the state court's determination based on state law, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  Here, the Court of Appeal found that, under *Russo* and *Vargas*, a unanimous jury instruction was not required because Pierce was charged with conspiracy to commit workers' compensation fraud and the

16

statutory provisions in question all described that single crime.  Because the state court found that "certain statutory alternatives are mere means of committing a single offense" rather than discrete crimes, this Court is "not at liberty to ignore that determination."  *Schad v. Arizona*, 501 U.S. 624, 636 (1991).

Even if Pierce could show that the various statutory provisions were individual crimes, his claim that the jury was unanimously required to find he committed the same crime fails.  Although the Supreme Court recently held that criminal defendants have the right to a unanimous jury in criminal cases, the Supreme Court decided not to extend this right to cases on collateral review.  *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) (noting that under *Teague v. Lane*, 489 U.S. 288 (1989), only "watershed rules" that implicate the "fundamental fairness [and accuracy] of the trial" are retroactive to cases on collateral review); *see also Edwards v. Vannoy*, 141 S. Ct. 1547, 1552 (2021) ("In light of the Court's well-settled retroactivity doctrine, we conclude that the *Ramos* jury-unanimity rule likewise does not apply retroactively on federal collateral review.").  Thus, even assuming that Pierce can show the various provisions were individual crimes, not conceded, he cannot demonstrate that the state appellate court's decision was contrary to or an unreasonable application of clearly established federal law.

Because the appellate court's rejection of Pierce's claim was not an unreasonable application of clearly established federal law as set forth by the Supreme Court nor based on an unreasonable determination of the facts, the undersigned finds ground one of the Petition should be denied.

**B.  Ground Two: Prosecutor's Alleged Bias**

**1.  Background**

In his second ground, Pierce claims that his Fifth and Fourteenth Amendment rights were violated because the prosecutor's office was biased against him.  (Doc. No. 1 at 7).  Pierce points out that the Kern County Workers' Compensation Fraud Unit, which is the local office responsible for prosecuting workers' compensation fraud cases, receives grant funding to support the staff and supplies necessary to prosecute such cases.  (Doc. No. 2-1 at 87).  The grant amounts are determined by the California Fraud Assessment Commission ("CFAC), which is comprised of

employees of workers' compensation insurance companies and self-insured employers.  (*Id*. at 87-88).  Pierce argues that because the prosecutor's office must expend all the funds each year for criminal prosecutions to receive funding for the next year, the prosecutor's office had a conflict of interest in prosecuting his case.  (Doc. No. 1 at 7).  Specifically, Pierce argues that the prosecutor's office was under a threat of losing its grant funding if the CFAC's prosecution goals were not met.  (*Id*.).  Pierce claims the CFAC emphasized restitution and criminal prosecutions as preferable over civil cases.  (*Id*.).  Pierce also claims that the prosecutor unnecessarily sought more restitution than was owed as a result of pressure from the CFAC.  (*Id*.).

At trial, Pierce sought the recusal of the prosecutor's office from the case due to the alleged conflict of interest.  (Doc. No. 14-24 at 189-96; Doc. No. 14-52 at 192-234).  The trial court denied Pierce's motion, finding that there was no actual or apparent conflict and that Pierce had failed to show an actual likelihood of prejudice.  (Doc. No. 2-4 at 51).  The trial court found that the prosecutor's office had wide latitude to set its own policies and procedures and had the discretion to deviate from these policies as it sees fit.  (Doc. No. 14-52 at 219).  Moreover, the trial court found that there "is nothing improper about a public agency (CFAC) seeking an efficient return on its investment or considering issues of efficiency in making law enforcement decisions."  (Doc. No. 14-96 at 51).  The trial court found Pierce had, at most, "shown that under certain conditions, a prosecutor might have a theoretical motive to pursue a non-meritorious case," but that was insufficient to meet Pierce's "burden of proving an actual or apparent conflict of interest, sufficiently grave to demonstrate an actual likelihood of prejudice."  (*Id*.).  The trial court stated that Pierce's contention, taken to its logical conclusion "would preclude the prosecution of any crime in which the victim was a resident of Kern County, since the District Attorney's Office is funded in part by county funds, and the source of such funds are taxes paid by Kern County residents."  (*Id*. at 55).

### 2. State Appellate Court Decision

The Court of Appeal agreed with the trial court's ruling, finding that no actual or apparent conflict of interest existed, and that Pierce had failed to show an actual likelihood of prejudice requiring recusal.  (*Id*. at 56).  In reaching its decision, the Court of Appeal adopted the

18

prosecutorial conflict of interest standard set forth in *People v. Eubanks*, 14 C.4th 580, 595-596 (1996), a California case.  The *Eubanks* court relied on Cal. Penal Code §1424, finding that to prove a prosecutorial conflict of interest, it must be "shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial."  *Id*. at 591.  The Court of Appeal found Pierce failed to show that he received an unfair trial due to any alleged conflict of interest.  In relevant part, the state court opined:

> [California Penal Code §] 1424 establishes the standard governing motions to recuse a prosecutor.  The motion "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial."  (§ 1424, subd. (a)(l).)  Under the statute, a defendant has the burden of showing by evidence that (1) a conflict of interest actually exists and (2) the level of conflict is so high that it is "unlikely that the defendant would receive a fair trial."  (§ 1424, subd. (a)(l).)  *People* v. *Eubanks* (1996) 14 Cal.4th 580, 592 *(Eubanks)* clarifies and expands this statutory standard to all portions of the proceedings, but it reiterates that even in the presence of actual conflict, the conflict must be of sufficient gravity to demonstrate an "actual likelihood of prejudice."

> We review the trial court's decision to deny a recusal motion for an abuse of discretion.  *(Hollywood* v. *Superior Court* (2008) 43 Cal.4th 721, 728-729.)  "Accordingly, we must determine whether the trial court's findings were supported by substantial evidence and whether, in turn, those findings support the decision to deny recusal.  [Citation.]"  *(People* v. *Gamache* (2010) 48 Cal.4th 347, 361-362.)  The defendant bears the burden of demonstrating a genuine conflict.  *(Haraguchi* v. *Superior Court* (2008) 43 Cal.4th 706, 709.)At issue is whether the statutory funding scheme for the investigation and prosecution of workers' compensation insurance fraud (Ins. Code,§ 1872.83) created a conflict of interest for the district attorney.  As argued by Pierce, a conflict exists because the Kem County Workers' Compensation Fraud Unit receives grant funding from the California Insurance Commission.  The funds, based on assessments statutorily imposed upon insurance companies, are used to criminally prosecute workers' compensation fraud cases, and includes the salaries and benefits of the two prosecutors in the unit (the prosecutor in this case being one of the two), as well as the salaries of the unit's investigator and paralegal, the computers and software.

> The grant funds are determined by the Fraud Assessment Commission, as outlined in Insurance Code section 1872.83, which provides in relevant part:
> "(b) To fund increased investigation and prosecution of workers' compensation fraud, ... there shall be an annual assessment as follows: ... [ ] ... [ ] (d) After incidental expenses, at least 40 percent of the funds to be used for the purposes of this section shall be provided to the Fraud Division of the Department of Insurance for

enhanced investigative efforts, and at least 40 percent of the funds shall be distributed to district attorneys, pursuant to a determination by the commissioner with the advice and consent of the division and the Fraud Assessment Commission, as to the most effective distribution of moneys for purposes of the investigation and prosecution of workers' compensation fraud cases and cases relating to the willful failure to secure the payment of workers' compensation.  Each district attorney seeking a portion of the funds shall submit to the commissioner an application setting forth in detail the proposed use of any funds provided.  A district attorney receiving funds pursuant to this subdivision shall submit an annual report to the commissioner with respect to the success of his or her efforts...."

The statute goes on to state that, if a district attorney is unable or unwilling to investigate and prosecute workers' compensation fraud claims, the commissioner "shall discontinue distribution of funds allocation for that county and may redistribute those funds according to this subdivision."  (Ins. Code, § 1872.83, subd. (e).)  As evidence of the alleged conflict, Pierce cites to an August 13, 2010, letter to the Department of Insurance addressing the anticipated 2011-2012 budget, in which the prosecutor in this case stated that the county "remain[ed] committed to utilizing our program funds to achieve high levels of productivity and maximum results; convictions; commitment rates and restitution for our victims."  An August 2012 letter from the Kem County Supervising District Attorney reiterated that sentiment.

Pierce alleges that, by accepting grant funding, the Kem County District Attorney agreed to criminally prosecute future cases, rather than civilly under Labor Code section 3820.  Pierce argues, "The starting point of every discretionary prosecution decision that involved the amount of money claimed stolen was skewed by the prosecutor's decision to maximize restitution to the insurance carrier victims, even if the loss claimed was more than was due."

We first determine whether a conflict of interest exists between the district attorney's office and the defendant.  A conflict exists if the evidence shows that the prosecutor is biased against the defendant, or if such animosity affects others within the prosecutorial office.  (*Eubanks, supra,* 14 Cal.4th at p. 596.)  The analysis focuses not on the mere appearance of a conflict of interest, but on a reasonable probability that the prosecution will treat the defendant unfairly.  (*People v. Neely* (1999) 70 Cal.App.4th 767, 776.)

Moreover, recusal of an entire prosecutorial office is a drastic step that imposes a substantial burden on the People.  (*Lewis v. Superior Court* (1997) 53 Cal.App.4th 1277, 1286.)  "[W]hen the entire prosecutorial office of the district attorney is recused and the Attorney General is required to undertake the prosecution or employ a special prosecutor, the district attorney is prevented from carrying out the statutory duties of his elective office and, perhaps even more significantly, the residents of the county are deprived of the services of their [locally] elected representative in the prosecution of crime in the county.'"  (*Eubanks, supra,* 14 Cal.4th

20

at p. 594, fn. 6.)  It is therefore reasonable to require that the defendant establish a showing that such a step is necessary to avoid an unfair trial.  *(Lewis v. Superior Court, supra,* at p. 1286.)

In *Eubanks,* on which Pierce relies, the question was whether a crime victim's payment of substantial investigative expenses already incurred by the public prosecutor created a disabling conflict of interest for the prosecutor, requiring his disqualification. The defendants in *Eubanks* were accused of conspiracy to steal trade secrets.  *(Eubanks, supra,* 14 Cal.4th at pp. 584-585.) Because the police department and prosecutor's office lacked staff with expertise to search the company's computers, a computer specialist was located and the company agreed to pay for the services.  The district attorney indicated he allowed the company to pay for the assistance because the computer specialist's role was purely technical, involving no opinion as to whether trade secrets had been stolen, and because the prosecutor's office was "experiencing serious budgetary constraints."  *(Id.* at p. 586.)  The superior court concluded the payment by the company put the district attorney in a position of feeling "a greater obligation for this particular victim," and the district attorney might not "exercise its discretionary function in an even-handed manner."  *(Id.* at p. 587.) The Court of Appeal reversed the recusal order, overturning the trial court's finding of conflict and holding that any conflict (if any) was insufficiently grave to justify recusal.  *(Eubanks, supra,* 14 Cal.4th at pp. 584, 587-588.)  The Supreme Court gave great deference to the trial court's discretion in finding the existence of a conflict of interest and reversed the Court of Appeal.  The Supreme Court also clarified that (despite the language of section 1424), the correct standard for recusal under that statute encompasses both actual and apparent conflicts and that the likelihood that a defendant would not receive a fair trial (or actual likelihood of prejudice in all portions of the proceedings) must be real and not apparent.  *(Eubanks, supra,* at pp. 592-593.)

Here, however, the entity providing the financial assistance is a public agency and not the actual victim (corporate or otherwise). As noted by the trial court here, Pierce confuses the role of a victim, as discussed in *Eubanks,* with the role of government agencies which represent the People and have obligations to follow statutory arrangements enacted by the Legislature. As stated by the trial court:

"Taken to its logical conclusion, [Pierce's] argument would preclude the prosecution of any crime in which the victim was a resident of Kem County, since the District Attorney's Office is funded in part by county funds, and the source of such funds are taxes paid by Kem County residents."

We agree with the trial court's finding that no actual conflict or apparent conflict existed, and that there was no showing of an actual likelihood of prejudice requiring recusal.  We reject Pierce's claim to the contrary.

(Doc. No. 14-96 at 52-56).

1

### 3.  Pierce is Not Entitle to Relief on Ground Two

2       As an initial matter, the Court of Appeal's decision is clearly based on California state

3   law.  To the extent Pierce claims that the Court of Appeal incorrectly interpreted state law, his

4   claim is not cognizable on federal habeas review.  As stated *supra*, federal habeas corpus relief

5   "does not lie for errors of state law," *Estelle*, 502 U.S. at 67, and this court is bound by the state

6   court's determination based on state law, *Bradshaw*, 546 U.S. at 76 (2005) ("[A] state court's

7   interpretation of state law, including one announced on direct appeal of the challenged conviction,

8   binds a federal court sitting in habeas corpus.").

9       To the extent Pierce claims that his federal constitutional rights have been violated by the

10  alleged conflict of interest, his claim fails.  Pierce has not identified, and the court is not aware, of

11  any clearly established United States Supreme Court precedent finding a prosecutorial conflict of

12  interest under circumstances similar to those presented here.  Although "[a] scheme injecting a

13  personal interest, financial or otherwise, into the enforcement process may bring irrelevant or

14  impermissible factors into the prosecutorial decision and in some contexts raise serious

15  constitutional questions," *Marshall v. Jerrico, Inc*., 446 U.S. at 249-250, a legislature "may, and

16  often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry

17  on such prosecutions rewards for thus acting in the interest of the State and the people."  *Tumey v.*

18  *Ohio*, 273 U.S. 510, 535 (1927).

19      The due process clause requires an "impartial and disinterested tribunal" which helps "to

20  guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted

21  conception of the facts or the law." *Marshall,* 446 U.S. at 242; *see also United States v.*

22  *Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) ("Due process guarantees that a criminal defendant

23  will be treated with that fundamental fairness essential to the very concept of justice.").

24  However, "[p]rosecutors need not be entirely neutral and detached."  *Marshall,* 446 U.S. at 242,

25  248.  Indeed, "[o]ur legal system has traditionally accorded wide discretion to criminal

26  prosecutors in the enforcement process."  *Id*. at 248; *see also Young v. United States ex rel.*

27  *Vuitton Et Fils S. A*., 481 U.S. 787, 807 (1987) (noting that "prosecutors may not necessarily be

28  held to as stringent a standard of disinterest as judges").  It is within the discretion of the

22

1 prosecutor to determine "which persons should be targets of investigation . . . [and] which

2 persons should be charged with what offenses." *Young*, 481 U.S. at 806; *Bordenkircher v. Hayes*,

3 434 U.S. 357, 364 (1978) ("[So] long as the prosecutor has probable cause to believe that the

4 accused committed an offense defined by statute, the decision whether or not to prosecute, and

5 what charge to file or bring before a grand jury, generally rests entirely in his discretion.").

6       Pierce has presented no evidence that the prosecutors in his case were actually biased

7 against him and the financial interest in question is "exceptionally remote." *Marshall*, 446 U.S. at

8 251. As respondent notes, at most, Pierce demonstrates that the statutory scheme establishing the

9 CFAC and grant funding served "to add zeal to the district attorney's investigation and

10 prosecution of workers' compensation insurance fraud." (Doc. No. 13 at 30). But such zeal is

11 not prohibited—"prosecutors are partisan advocates who are permitted to be zealous in their

12 enforcement of the law." *Marshall*, 446 U.S. at 248-50.

13       Instead, to succeed on his claim of prosecutorial conflict of interest or bias, Pierce must

14 "demonstrate that his trial was rendered fundamentally unfair" by any alleged influence of the

15 CFAC on the prosecutors. *Gallego v. McDaniel*, 124 F.3d 1065, 1079 (9th Cir. 1997); *Smith v.*

16 *Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged

17 prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Here,

18 Pierce has failed to do so—he provides no evidence to demonstrate his trial was unfair.

19       Because the state court's decision was not contrary to, or an unreasonable application of,

20 clearly established Supreme Court precedent, not an unreasonable determination of the facts,

21 ground two should be denied.

22       **IV.  CERTIFICATE OF APPEALABIILTY**

23       A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

24 court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253;

25 *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). Rule 11 Governing § 2254 Cases requires a

26 district court to issue or deny a certificate of appealability when entering a final order adverse to a

27 petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

28 Cir. 1997). A certificate of appealability will not issue unless a petitioner makes "a substantial

1    showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This standard requires

2    the petitioner to show that "jurists of reason could disagree with the district court's resolution of

3    his constitutional claims or that jurists could conclude the issues presented are adequate to

4    deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

5    *McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the

6    denial of a constitutional right.  Thus, the undersigned recommends that the court decline to issue

7    a certificate of appealability.

8         Accordingly, it is **RECOMMENDED**:

9          1.   Petitioner be denied all relief on his petition.  (Doc. No. 1).

10         2.   Petitioner be denied a certificate of appealability.

11                                **NOTICE TO PARTIES**

12        These findings and recommendations will be submitted to the United States district judge

13   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen (14)

14   days after being served with these findings and recommendations, a party may file written

15   objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

16   Findings and Recommendations."  Parties are advised that failure to file objections within the

17   specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834,

18   838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

19

20   Dated:    January 13, 2022    

21                                      HELENA M. BARCH-KUCHTA

22                                      UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28